IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZACHARY WILSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JEFFREY A. BEARD, ET AL. | : | NO.  02-374 |

<u>MEMORANDUM</u>

**Padova, J.**                                                                            **April 20, 2012**

On April 19, 2004, we granted Petitioner Zachary Wilson's Petition for Writ of Habeas
Corpus brought pursuant to 28 U.S.C. § 2254 because Wilson had established, by a preponderance
of the evidence, that the assistant district attorney who prosecuted him for the murder of David Swift
engaged in intentional racial discrimination during jury selection, in violation of the Fourteenth
Amendment to the United States Constitution.  <u>Wilson v. Beard</u>, 314 F. Supp. 2d 434, 438, 450
(E.D. Pa. 2004) ("<u>Wilson I</u>"), <u>aff'd</u> 426 F.3d 653 (3d Cir. 2005).  Our April 19, 2004 Order
conditionally granted the Writ and permitted the Commonwealth to retry Wilson within 180 days,
after which the Writ became unconditional.  <u>Id.</u> at 450.  In January 2010, nearly six years after we
granted Wilson's Petition, the Commonwealth began proceedings to retry Wilson for the Swift
murder.  Presently before the Court are two Motions filed by Wilson, the "Motion to Enforce Writ
of Habeas Corpus" and "Motion for Relief under FRCP 60(b)(6)," through which he seeks to prevent
the Commonwealth from ever retrying him for the Swift murder.  For the reasons that follow, both
Motions are denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    <u>The Swift Murder</u>

Wilson was tried before a jury in the Philadelphia County Court of Common Pleas between

May 10, 1986 and May 16, 1986, for the February 1, 1982 murder of David Swift.  The only eyewitness to the murder was Leonard Guess, whose credibility was a central issue in Wilson's trial. Guess testified about the circumstances of Swift's murder as follows.  Guess called Scotty's Garage on the evening of February 1, 1982, looking for a game of craps.  N.T. at 2.36-2.37, Commonwealth v. Wilson, No. 51-CR-1229141-1983 (Phila. Cnty. C. P. May 11, 1984) ("N.T. 5/11/84").  Swift answered the garage's phone and told Guess he would pick him up and drive him to the garage.  Id. at 2.37-2.38.  Swift picked up Guess and also stopped to pick up Wilson on the way back to the garage.  Id. at 2.38-2.39.  Once they arrived at Scotty's Garage, Swift and Wilson shot craps for a while, then got into an argument over a $20 bet.  Id. at 2.41-2.42.  During the argument, Wilson pulled out a .38 caliber pistol and threatened to kill Swift if Swift didn't give him $20.  Id. at 2.42-2.43.  Louis Scott, the owner of the garage, then stepped in and told Swift to comply.  Id. at 2.44-2.45.  Swift gave Wilson the $20.  Id. at 2.45.  Scott then told Swift, Guess and Wilson to leave.  Id. at 2.45-2.46.  Swift left first, Wilson and Guess left two or three minutes later.  Id. at 2.46.  Guess and Wilson initially left the garage together, but Guess returned to the garage to retrieve his dice. Id. at 2.46-2.48.  After Guess re-entered the garage he heard a shot outside, he then ran back outside, towards Swift's car and, from a distance of 40-50 feet, saw Wilson shoot into the driver's side of Swift's car three times  Id. at 2.48-2.50. Guess then went back into the garage and asked Scott to call the police.  Id. at 2.51.  Guess left the scene after the police arrived.  Id.  Guess was questioned by the police ten days later.  Id. at 2.54.

Wilson attempted to impeach Guess's credibility at trial through his own testimony, and through the testimony of two attorneys who had represented Guess before trial, Darryl Irwin and Adam Renfroe, Jr.  Wilson testified that he saw Guess after he (Wilson) was arrested for Swift's

2

murder and Guess told him that he (Guess) had implicated Wilson in the shooting because the police threatened to prosecute him (Guess) for the murder unless he implicated Wilson.  N.T. at 3.24, Commonwealth v. Wilson, No. 51-CR-1229141-1983 (Phila. Cnty. C. P. Pleas May 14, 1984) ("N.T. 5/14/84").  Irwin, who also briefly represented Wilson in connection with the Swift murder, testified that, on October 5, 1983, he represented Guess in an effort to persuade a judge to lift a bench warrant that had been lodged against Guess for failing to appear to testify against Wilson in 1982.  Id. at 3.54-3.57, 3.59.  Guess told Irwin that he was acting as a prosecution witness because he had been threatened by homicide detectives and, in fact, he had not seen anything.  Id. at 3.60-3.61.

Renfroe testified that he had represented Guess during Wilson's prosecution for Swift's murder, at which time he also represented Wilson in connection with the murder.  Id. at 3.107, 3.110, 3.112.  Renfroe testified that Guess had been jailed for at least one week, because he did not want to testify against Wilson.  Id. at 3.110-3.111.   Renfroe further testified that Guess told him that detectives had threatened to prosecute him (Guess) for the Swift murder if he refused to testify against Wilson.  Id. at 3.126.

The Commonwealth called four witnesses on rebuttal to support Guess's testimony.  Police Detective Harmon, Assistant District Attorney James Long , Assistant District Attorney Carroll, and Guess all testified that Guess was not harassed or threatened by police or the prosecution and that he had always been consistent in reporting that he had seen Wilson shoot Swift.  Id. at  3.149-3.150, 3.153-3.154, 3.162, 3.173-3.176; N.T. at 8,  Commonwealth v. Wilson, No. 51-CR-1229141-1983 (Phila. Cnty. C. P. May 15, 1984).

Wilson was convicted of first degree murder and possession of an instrument of crime and sentenced to life in prison.  Commonwealth v. Wilson, No. 51-CR-1229141-1983, docket (Phila.

Cnty. C. P.).  On November 17, 1987, the Superior Court of Pennsylvania affirmed his conviction.

Commonwealth v. Wilson, 536 A.2d 830 (Pa. Super. Ct. 1987).  On January 4, 1988, he filed a *pro se* petition for relief pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. § 9541, *et seq.*, and counsel was appointed to represent him.  Wilson I, 314 F. Supp. 2d at 438.  On March 30, 1994, the PCRA Court denied the petition and on  November 13, 1995, the Superior Court affirmed.  Commonwealth v. Wilson, No. 1421 PHL 1994 (Pa. Super. Ct. Nov. 13, 1995) (per curiam).

On June 2, 1997, Wilson filed a second PCRA petition, claiming for the first time that Jack McMahon, the assistant district attorney who prosecuted him for the Swift murder, had discriminated on the basis of race in jury selection in violation of Batson v. Kentucky, 476 U.S. 79 (1986), and Swain v. Alabama, 380 U.S. 202 (1965).  Wilson I, 314 F. Supp. 2d at 438.  Wilson's claim was based on a videotaped lecture delivered by McMahon, sometime in 1986, two years *after* Wilson was convicted of the Swift murder, but which was not released to the public until late March or early April 1997.  Id. at 438-39.  On February 10, 1999, the PCRA Court denied Wilson's second PCRA petition and the Superior Court affirmed that decision on July 31, 2000.  Commonwealth v. Wilson, No. 783 EDA 1999 (Pa. Super. Ct. July 31, 2000) (per curiam).

On January 23, 2002, Wilson filed a counseled petition for writ of habeas corpus in this Court, asserting a claim of racial discrimination in jury selection under Batson and Swain.  Wilson I, 314 F. Supp. 2d at 439.  On April 19, 2004, after holding an evidentiary hearing on Wilson's claim, we found that he had "established, by a preponderance of the evidence, that Mr. McMahon's decision to exercise a peremptory strike against one or more African-American members of the jury venire at [his] trial was motivated by racial discrimination."  Id. at 439, 450.  We granted the Writ

as follows:

> AND NOW, this 19th day of April, 2004, upon careful and independent review of the Petition for a Writ of Habeas Corpus (Docket # 1), the Report and Recommendation of Magistrate Judge Linda Caracappa, the hearings held on January 29, 2003, and September 29, 2003, and all related submissions, **IT IS HEREBY ORDERED** that the Petition for a Writ of Habeas Corpus is **GRANTED**. **IT IS FURTHER ORDERED** that Petitioner's convictions of May 16, 1984 for First Degree Murder and Possessing an Instrument of Crime, see Commonwealth v. Wilson, Nos. 2914, 2916 (December Term, 1983), are **VACATED**. The Commonwealth of Pennsylvania may retry Petitioner on these charges within 180 days of the date of this Order.

Id. at 450. The United States Court of Appeals for the Third Circuit affirmed our Order granting the Writ on October 13, 2005. Wilson v. Beard, 426 F.3d at 670. The Third Circuit issued its mandate on October 31, 2005. Wilson v. Beard, No. 04-2461, docket (3d Cir.). The Commonwealth sought additional time to file a petition for writ of certiorari with the Supreme Court and the filing deadline was extended until March 13, 2006. Id. The Commonwealth notified the Supreme Court on March 13, 2006, that it would not file a petition for writ of certiorari. (Resp'ts' 11/18/11 Mem. at 8.)

     B.    The Lamb Murder

On January 7, 1988, after his conviction for the Swift murder, Wilson was convicted and subsequently sentenced to death for first degree murder and possession of an instrument of crime for the August 3, 1981 murder of Jamie Lamb. See Wilson v. Beard, Civ. A. No. 05-2667, 2006 WL 2346277, at *1 (E.D. Pa. Aug. 9, 2006) ("Wilson II"). Wilson's conviction for the Swift murder was one of the aggravating circumstances leading to his death sentence. Id. ("The jury found two aggravating circumstances -- a significant history of violent felony convictions and the knowing creation of a grave risk of death to others -- and no mitigating circumstances. The jury returned a

death sentence." (citations omitted)).  The Pennsylvania Supreme Court affirmed on direct appeal.

Commonwealth v. Wilson, 649 A.2d 435 (Pa. 1994).  On March 11, 1996, Wilson filed a counseled

PCRA petition, which was later amended to include a claim that the prosecutor failed to provide his

trial counsel with exculpatory evidence regarding the Commonwealth's three main witnesses against

him.  Commonwealth v. Wilson, 861 A.2d 919, 923, 927-28 (Pa. 2004).  The PCRA Court denied

the PCRA petition on May 6, 1998.  Commonwealth v. Wilson, 230 CAP, docket (Pa.).  The

Pennsylvania Supreme Court affirmed the denial of the PCRA petition on November 19, 2004.

Wilson, 861 A.2d at 935.

On June 6, 2005, Wilson filed a counseled petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254 with this Court.  The Petition asserted a claim that the assistant district attorney who

prosecuted Wilson for the Lamb murder violated Brady v. Maryland, 373 U.S. 83 (1963), by failing

to provide his counsel with exculpatory information that would have allowed his counsel to impeach

the testimony of the three main witnesses against him (two eyewitnesses and one individual who

claimed that Wilson had made a jailhouse confession).  Wilson II, 2006 WL 2346277, at *3.  We

conditionally granted the Writ on August 9, 2006.  Id. at *17;  The Commonwealth appealed and,

on January 29, 2007, at the Commonwealth's request, we stayed our order granting the Writ.  Wilson

v. Beard, Civ. A. No. 05-2667 (E.D. Pa. Jan. 29, 2007) (order staying case).  The Third Circuit

affirmed our August 9, 2006 Order granting the Writ on December 23, 2009.  Wilson v. Beard, 589

F.3d 651 (3d Cir. 2009).  On June 3, 2010, the Third Circuit certified its December 23, 2009 order

in lieu of issuing a mandate, and we lifted the stay imposed by our January 29, 2007 order on June

9, 2010.  Wilson v. Beard, Civ. A. No. 05-2667 (E.D. Pa. June 9, 2010) (order lifting stay).

C.      The Commonwealth's Proceedings to Retry Wilson for Both Murders

The Commonwealth began proceedings to retry Wilson for Swift's murder soon after the Third Circuit affirmed our Order granting the Writ with respect to Wilson's conviction for the Lamb murder.  On January 22, 2010, the Philadelphia County Court of Common Pleas appointed counsel for Wilson in connection with his prosecution for the Swift murder, and on February 16, 2010, he appeared before Judge Benjamin Lerner and was re-arraigned on the charges relating to the Swift murder.  See Commonwealth v. Wilson, No. 51-CR-1229141-1983, docket (Phila. Cnty. C. P.).  The Philadelphia County Court of Common Pleas appointed counsel for Wilson in connection with his prosecution for the Lamb murder on September 7, 2010, and he was re-arraigned on the charges relating to the Lamb murder on October 5, 2010 and is currently awaiting trial.  Commonwealth v. Wilson, No. 51-CR-0929501-1986, docket (Phila. Cnty. C. P.).

D.      The Current Federal Court Proceedings

On February 18, 2010, Wilson filed the Motion to Enforce Writ of Habeas Corpus (the "Motion to Enforce") in this Court, seeking to prevent the Commonwealth from retrying him for the Swift murder.  Wilson's prosecution for the Swift murder has been stayed since Wilson filed the Motion to Enforce.  Commonwealth v. Wilson, No. 51-CR-1229141-1983, docket (Phila. Cnty. C. P.).

We held argument on the Motion to Enforce on June 2, 2010 and scheduled the matter for an evidentiary hearing.  On September 29, 2010, Wilson filed the "Motion for Relief Under FRCP 60(b)(6)" (the "Rule 60(b)(6) Motion"), asking that we vacate our April 19, 2004 Order and issue a new order, granting an unconditional writ and prohibiting Wilson's retrial for the Swift murder.  We held evidentiary hearings in connection with both Motions on May 31, 2011, June 2, 2011, June

7

24, 2011, and July 14, 2011.   The parties subsequently filed proposed findings of fact and conclusions of law and a final argument was held on the Motions on April 11, 2012.

## II.   THE MOTION TO ENFORCE

Wilson argues, in the Motion to Enforce, that the Commonwealth is forever barred from retrying him for the Swift murder because it waited more than 180 days after we issued the Writ to commence proceedings relating to his reprosecution.[1]   Wilson relies on the portion of our April 19, 2004 Order that states:  "The Commonwealth of Pennsylvania may retry Petitioner on these charges within 180 days of the date of this Order."   Wilson I, 314 F. Supp. 2d at 450.  Wilson, however, cites no authority for the proposition that we may bar his retrial based solely on the Commonwealth's failure to retry him within 180 days, and his argument evidences a misunderstanding of the nature of a conditional writ of habeas corpus.

The issuance of a writ of habeas corpus is, in essence, a declaration, "that the petitioner is being held in custody in violation of his constitutional (or other federal) rights."   Harvest v. Castro, 531 F.3d 737, 741 (9th Cir. 2008) (citing 28 U.S.C. § 2254(a), and Preiser v. Rodriguez, 411 U.S. 475, 484 (1973)).   When the district court issues the writ, it may order that the petitioner be released immediately, or it may make his release conditional:

"Where a state prisoner has obtained from a district court a decision

---

[1]The Commonwealth argues that, having already granted the Writ, we now lack jurisdiction to entertain the Motion to Enforce.  See Eddleman v. McKee, 586 F.3d 409, 413 (6th Cir. 2009) (noting that, since 28 U.S.C. § 2254 only grants the federal courts jurisdiction to hear the claims of a state prisoner in custody pursuant to a state court judgment, "once the unconstitutional judgment is gone, so too is federal jurisdiction under § 2254").  However, the district court "retains jurisdiction to determine whether a party has complied with the terms of a conditional order in a habeas case." Gentry v. Deuth, 456 F.3d 687, 692 (6th Cir. 2006) (internal quotation omitted).  Since the Motion to Enforce asks us to ensure that the Commonwealth complies with our April 19, 2004 Order, we retain jurisdiction to consider this Motion.

> that his state confinement is unlawful, he is entitled to an order that
> such confinement be ended.  The district court's final order may be
> in one of two forms.  It may unconditionally order the prisoner's
> release, or it may order his release at some time in the near future if,
> in the meantime, he has not been afforded a new trial."

Carter v. Rafferty, 781 F.2d 993, 994 n.2 (3d Cir. 1986), overruled on other grounds by Hilton v.

Braunskill, 481 U.S. 770 (1987) (quoting United States ex rel. Thomas v. State of New Jersey, 472

F.2d 735, 742 (3d Cir. 1973)).  Our April 19, 2004 Order is "a conditional order of release . . . which

orders the State to release the petitioner unless the State takes some remedial action" that would

make his detention constitutional.  Harvest, 531 F.3d at 741-42 (citations omitted).  Conditional

writs "'are essentially accommodations accorded to the state . . . [that] provide[] the state with a

window of time within which it might cure the constitutional error.  Failure to cure that error . . .

justifies the district court's release of the petitioner.'"  Gibbs v. Frank, 500 F.3d 202, 208 (3d Cir.

2007) (quoting Phifer v. Warden, 53 F.3d 859, 864-65 (7th Cir. 1995)).  Consequently, an order

granting the state a limited window of time to retry the petitioner is not an absolute deadline for

retrial.  Rather, if the state fails to retry the petitioner within the time period set in the conditional

writ, the writ simply comes absolute.  See Gentry v. Deuth, 456 F.3d 687, 692 (6th Cir. 2006)

("[T]he sole distinction between a conditional and an absolute grant of the writ of habeas corpus is

that the former lies latent unless and until the state fails to perform the established condition, at

which time the writ springs to life."  (citations omitted)).  Consequently, once the 180 day window

for the Commonwealth's retrial of Wilson had passed without the Commonwealth taking any action

to retry him, the conditional Writ became absolute and the Commonwealth could no longer imprison

Wilson based upon his conviction for the Swift murder.

　　　　Wilson, however, was not held in custody in connection with his conviction for the Swift

murder at any time after the Writ became absolute in this case.  Rather, between January 7, 1988 and

June 9, 2010, he was held as a convicted prisoner awaiting execution for the murder of Jamie Lamb.

Since June 9, 2010, Wilson has been held as a pretrial murder defendant in connection with his

retrials for both the Swift and Lamb murders.

Our April 19, 2004 Order, moreover, does not prevent the Commonwealth from ever retrying

Wilson for Swift's murder.  When a habeas writ is issued, "[i]t is petitioner's *conviction,* not his

*indictment,* which has been declared unconstitutional by the federal court." Carter, 781 F.2d at 998

(citation omitted).  Consequently, once the writ becomes absolute, the petitioner's "position is now

no more or less than that of any other state-indicted, not-yet-tried individual." Id.  As the United

States Court of Appeals for the Sixth Circuit has explained:

> That a petitioner's first trial was unconstitutional in some respect,
> generally does not mean he can never be tried again. The power to
> "release" a prisoner under § 2254 normally is not a power to release
> him forever from the underlying charge. It is the power, instead, only
> to release him from custody pursuant to the unconstitutional
> judgment.

Eddleman v. McKee, 586 F.3d 409, 413 (6th Cir. 2009); see also Scott v. Michigan State, 359 F.

App'x 579, 582 (6th Cir. 2009) (stating that the state is not precluded from rearresting a successful

habeas petition and "'retrying him under the same indictment'" (quoting Satterlee v. Wolfenbarger,

453 F.3d 362, 370 (6th Cir. 2006), and citing Wilkinson v. Dotson, 544 U.S. 74, 83 (2005))); Foster

v. Lockhart, 9 F.3d 722, 727-28 (8th Cir. 1993) ("If the state fails to correct the defect within the

given time and the prisoner is released from custody, the state may usually still rearrest and

reprosecute the prisoner." (citing Moore v. Zant, 972 F.2d 318, 320 (11th Cir.1992)).  We conclude,

accordingly, that our April 19, 2004 Order does not, in itself, bar the Commonwealth from retrying

Wilson even though it failed to commence proceedings related to the retrial within the 180 day time period and that the Commonwealth's failure to retry Wilson within that period did not violate the terms of the Writ.  The Motion to Enforce is, therefore, denied.

## III.   THE RULE 60(b)(6) MOTION

### A.   Legal Standard

Wilson argues, in the Rule 60(b)(6) Motion, that we should vacate our April 19, 2004 Order and issue a new order, granting an unconditional writ of habeas corpus and barring his retrial for the murder of David Swift because the Commonwealth's delay in commencing the proceedings related to his retrial has created extraordinary circumstances which may be remedied only by such relief. Rule 60(b)(6) provides that a district court may "relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons . . . (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b).  "[A] movant seeking relief under Rule 60(b)(6) [is required] to show 'extraordinary circumstances' justifying the reopening of a final judgment." Gonzalez v. Crosby, 545 U.S. 524, 535 (2005) (citations omitted).  "Such circumstances will rarely occur in the habeas context." Id.  If we vacate a judgment pursuant to Rule 60(b), "the case is returned to the procedural posture in which it existed prior to [our] entry of judgment." D'Ambrosio v. Bagley, 688 F. Supp. 2d 709, 731 (N.D. Ohio 2010), aff'd 656 F.3d 379 (6th Cir. 2011), cert. denied 132 S. Ct. 1150 (2012).

Wilson contends that extraordinary circumstances exist in this case because: (1) the Commonwealth delayed commencing his reprosecution for the Swift murder for more than five years after we granted the Writ; (2) during the time in which the Commonwealth delayed his retrial, his mental condition deteriorated to such an extent that he is no longer competent to stand trial; and (3)

11

his counsel have recently discovered that the prosecution committed a <u>Brady</u> violation at his trial with respect to prosecution witness Guess and Guess's mental condition has deteriorated so dramatically since 2005 that he would not be competent to testify at Wilson's retrial or to be cross-examined about the alleged <u>Brady</u> issue.  The Commonwealth opposes these claims on the merits and also argues that these claims together constitute a Sixth Amendment speedy trial claim that must be exhausted in state court pursuant to 28 U.S.C. § 2254(b) before it may be considered by a federal court.  It is absolutely clear from the record before us that Wilson did not raise any of these claims before the Pennsylvania state courts prior to filing the instant Rule 60(b)(6) Motion.

  B.  Exhaustion

  A habeas petitioner must exhaust his claims in state court prior to asserting them in federal court, unless:  "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant."   28 U.S.C. § 2254(b)(1)(B).  The exhaustion requirement applies to "new claims a habeas petitioner may raise in seeking relief from a final order under Fed. R. Civ. P. 60(b)."  <u>Landano v. Rafferty</u>, 897 F.2d 661, 668 (3d Cir. 1990) (footnote omitted) (citing <u>Pitchess v. Davis</u>, 421 U.S. 482, 489-90 (1975)); <u>see also</u> <u>Pitchess</u>, 421 U.S. at 490 ("Neither Rule 60(b), 28 U.S.C. § 2254, nor the two read together, permit a federal habeas court to maintain a continuing supervision over a retrial conducted pursuant to a conditional writ granted by the habeas court." (citation omitted)).   "[T]he exhaustion requirement is premised on the principles of federal-state comity."  <u>DiSimone v. Phillips</u>, 518 F.3d 124, 127 (2nd Cir. 2008).  It "ensures that the federal government, 'anxious though it may be to vindicate and protect federal rights and federal interests,' does so in a way that 'will not unduly interfere with the legitimate activities of the States.'"  <u>Id.</u> (quoting <u>Younger v. Harris</u>, 401 U.S. 37,

44 (1971)).  Exhaustion thus "protects sovereign states from presumptuous correction of their constitutional errors until their courts have been given every opportunity permitted in their procedure to correct their own mistakes."  Id.

We first examine whether Wilson's claims together constitute a claim that his Sixth Amendment right to a speedy trial has been violated.  "The Sixth Amendment guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial.'"  Vermont v. Brillon, 129 S. Ct. 1283, 1290 (2009) (alterations in original) (quoting U.S. Const. amend. VI).  The right to a speedy trial was designed to protect three interests:  "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."  Barker v. Wingo, 407 U.S. 514, 532 (1972) (footnote omitted).  The third interest is the most important "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  Id.  "If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past."  Id.

Wilson specifically argues that his retrial should be barred in this case because he has been prejudiced by the Commonwealth's extraordinary, five year delay in commencing his reprosecution for the Swift murder.  He contends that he was competent to stand trial in 2004, when we issued the Writ, but has suffered a dramatic deterioration in his mental health since that time, rendering him presently incompetent to be tried.  Wilson supports his argument with the expert testimony, and written report, of Dr. Julie B. Kessel, who opined that "Mr. Wilson's mental state has deteriorated significantly since 2007, and he has become severely delusional and dysfunctional since 2008." (Pet'r's Ex. 2 at 12.)  She further opined that Wilson would have been "able to participate

13

meaningfully with his attorneys[,]" if the Commonwealth had retried him "more expeditiously subsequent to the legal rulings which occurred in 2004," however, "[t]hat is no longer the case." Id.[2] Wilson has also presented evidence that Guess's physical health has deteriorated since he suffered from a stroke in 1993, and that his mental health has deteriorated since 2005.  (6/24/11 Hr'g Tr. at 82-85.)

The prejudice Wilson claims he will suffer as a result of the Commonwealth's delay is clearly the kind of prejudice the speedy trial right was designed to protect against.  See Barker, 407 U.S. at 532.  The Supreme Court has adopted a balancing test for violations of the Sixth Amendment right to a speedy trial that weighs the conduct of both the prosecution and the defendant, instructing that courts should weigh the following four factors:  "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  Id. at 530 (footnote omitted).  If the court finds, after weighing the Barker factors, that the defendant's right to a speedy trial has been violated, the only remedy is dismissal of the indictment.  Id. at 522.  It appears, therefore, that Wilson seeks to protect his right to a speedy trial and that the remedy he seeks, prevention of his retrial, is a remedy that is available to him for violation of his Sixth Amendment right to a speedy trial.

The United States Court Courts of Appeals for the Tenth and Eleventh Circuits have both decided that claims such as Wilson's, that a successful habeas petitioner's retrial should be barred because the state failed to retry the petitioner within the time provided by the conditional writ, are Sixth Amendment speedy trial claims that must be exhausted in the state courts before they can be

---

[2]As we discuss in Section III.C.2., *infra*, the parties presented conflicting evidence regarding Wilson's competency during our evidentiary hearings on the instant Motions.

considered by the federal courts.  In Capps v. Sullivan, 13 F.3d 350 (10th Cir. 1993), the Tenth Circuit concluded that a successful habeas petitioner who sought an order barring the state from retrying him because it failed to retry him within the 90 day period provided by the conditional writ issued by the district court was not entitled to the relief he sought.  Id. at 352-53.  While the petitioner might "have a claim that the failure to promptly retry him violated his Sixth Amendment right to a speedy trial[,]" such a claim would only be cognizable if brought in "a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241," after the petitioner satisfied the exhaustion requirement.  Id. at 353-54 (footnote omitted).  The Eleventh Circuit considered this issue in Moore, in which the district court granted the conditional writ in a death penalty case, giving the state 180 days to resentence the petitioner.  Moore, 972 F.2d at 319.  The state waited almost two years to resentence the petitioner, who then sought an order from district court that would prevent his resentencing.  Id.  The Eleventh Circuit noted that the petitioner had Sixth Amendment speedy trial rights that applied to his resentencing, but determined that the district court did not have the authority to adjudicate those rights in connection with the petitioner's original habeas proceeding.  Id. at 320. Instead, the petitioner would have to assert his speedy trial claim "in state court when the state attempts to resentence him."  Id.  If the state courts did not rule in his favor, he could, after exhausting his state remedies, assert his speedy trial claim in federal court, in "a new habeas case, asserting constitutional claims that arose after the filing of this habeas petition, after the constitutional claims properly asserted in this case had already been adjudicated, and after a retrial on sentencing was already called for."  Id. at 320-21 (citing Pitchess, 421 U.S. at 490).

    We conclude that Wilson's claims that he has been so prejudiced by the Commonwealth's purposeful delay of his retrial that his retrial should be barred is, at its core, a Sixth Amendment

speedy trial claim.  See Capps, 13 F.3d at 353-54; Moore, 972 F.2d at 320-21.  These are new claims that arose from events that occurred after we granted the Writ in 2004 and are not related to the Batson claim Wilson raised in his habeas petition.  Consequently, we next examine  whether these claims must be exhausted in state court before they may be raised in federal court.

Wilson contends that he does not have to exhaust his claims relating to the Commonwealth's delay in retrying him because the exhaustion requirement applies only to an application for relief brought pursuant to 28 U.S.C. § 2254.  His argument, however, ignores the Third Circuit's holding in Landano that the exhaustion requirement also applies to "new claims a habeas petitioner may raise in seeking relief from a final order under Fed. R. Civ. P. 60(b)."  Landano, 897 F.2d at 668 (footnote omitted) (citing Pitchess, 421 U.S. at 489-90).  Wilson contends that Landano is inapposite, because Landano's initial habeas petition was unsuccessful and his Rule 60(b) motion raised a new violation of his constitutional rights for which he sought habeas relief.  Wilson claims that, as a successful habeas petitioner, he is not seeking habeas relief through the Rule 60(b)(6) Motion, he is merely seeking a modification of the Writ that has already been issued.

While the circumstances in Landano may have been different from those in the instant case, it is clear that a habeas petitioner must exhaust all new claims that are raised in a Rule 60(b)(6) motion, not just claims that raise an alternative ground for habeas relief that was initially denied. The Supreme Court made it clear in Pitchess that a successful habeas petitioner, like Wilson, who returns to the district court claiming that new circumstances have arisen that warrant barring his retrial must exhaust those new claims in state court.  In Pitchess, the district court granted the petitioner's petition for writ of habeas corpus because the prosecution failed to provide defense counsel with a laboratory report, thereby violating petitioner's Brady rights.  See Pitchess, 421 U.S.

16

at 483.  When the state began proceedings to retry the petitioner, it discovered that certain physical evidence had been destroyed "as a matter of police routine sometime during the six years between the time [petitioner's] conviction became final and issuance of the conditional writ of habeas corpus."  Id. at 484.  The petitioner then filed a Rule 60(b)(6) motion with the district court, asking it to modify its prior order granting the conditional writ and to replace it with an order granting an unconditional writ and baring his retrial.  Id. at 485.  The district court granted the motion, finding that the destruction of evidence violated Brady and could prevent the petitioner from receiving a fair trial.  Id.  The United States Court of Appeals for the Ninth Circuit affirmed.  Id. at 485-86.  The Supreme Court reversed, remanding to the district court with instructions to vacate the order barring petitioner's retrial because he had not exhausted his Brady claim related to the destruction of evidence in state court.  Id. at 490.  In reversing the decision of the Ninth Circuit, the Supreme Court specifically rejected the argument that Wilson raises in this case, that exhaustion applies only to a habeas petition and not to a Rule 60(b) motion requesting a new form of relief for an already granted writ.  Id. at 489-90 (stating that the reasoning of the Court of Appeals, "that the exhaustion requirement is inapplicable to the new contention raised in [petitioner's] motion, since the motion was authorized under Fed. Rule Civ. Proc. 60(b)(6) as a motion for relief from a final order" was "incorrect").

Wilson also argues that he does not have to exhaust the claims he has raised in the Rule 60(b)(6) motion because claims of delay and prejudice brought in a Rule 60(b)(6) motion need not be exhausted.  Wilson relies on D'Ambrosio, 656 F.3d at 382.  D'Ambrosio, who had been convicted of murder in state court, filed a habeas petition asserting Brady violations.  Id. at 381.  The district court "concluded that the prosecution had failed to disclose exculpatory evidence in violation

of [Brady], and granted a conditional writ, requiring the state either to set aside D'Ambrosio's convictions and sentences or to conduct another trial." Id. (footnote and citation omitted).  The Sixth Circuit affirmed.  Id. (citations omitted).  One week before his state court retrial was scheduled to commence, D'Ambrosio learned that the state had failed to turn over additional evidence to his trial counsel.  Id.  He returned to the district court and asked that the district court issue an unconditional writ barring his reprosecution because the state had failed to comply with the writ.  Id. at 382.  The district court denied D'Ambrosio's motion, but, on April 27, 2009, issued an new, unconditional, writ expunging D'Ambrosio's conviction, because the state had violated the terms of the conditional writ by failing to "respond to multiple discovery requests; produc[ing] material, relevant items of discovery on the eve of trial; and then [seeking] to interfere with the orderly progress of the trial through gamesmanship."  Id. (internal quotations omitted).  On April 26, 2009, the day before the district court issued the unconditional writ, the prosecution's main witness against D'Ambrosio died.  The state, which learned of the death shortly after it occurred, did not notify D'Ambrosio until July.  Id.  D'Ambrosio then filed a Rule 60(b) motion with the district court, asking that the district court vacate its April 27, 2009 order and issue a new order barring his retrial.  Id.  The district court granted that motion on March 3, 2010, finding that the circumstances were extraordinary and warranted relief pursuant to Rule 60(b) for the following reasons:

> "For 20 years, the State held D'Ambrosio on death row, despite wrongfully withholding evidence that would have substantially increased a reasonable juror's doubt of D'Ambrosio's guilt.  Despite being ordered to do so by this Court during the extensive habeas proceedings before it, the State still failed to turn over all relevant and material evidence relating to the crime of which D'Ambrosio was convicted.  Then, once it was ordered to provide D'Ambrosio a constitutional trial or release him within 180 days, the State did neither. During those 180 days, the State engaged in substantial

> inequitable conduct, wrongfully retaining and delaying the production
> of yet more potentially exculpatory evidence.  And, as the 180–day
> deadline approached, certain of the State's counsel baselessly
> attacked the state trial judge, came before this Court and supplied
> testimony that, charitably, only can be described as strain[ing]
> credulity, and showed startling indifference to D'Ambrosio's rights.
> Because the state failed to retry D'Ambrosio within 180 days,
> moreover, the critical State's witness -- the man around whom the
> entire theory of the State's case revolved -- is no longer available for
> trial, a fact the State knew but withheld from D'Ambrosio, the state
> court, and this Court. To fail to bar retrial in such extraordinary
> circumstances surely would fail to serve the interests of justice."

Id. at 383 (alteration in original) (quoting D'Ambrosio, 688 F. Supp. 2d at 727-28).  The state

appealed, arguing only that the district court did not have jurisdiction to consider the claims raised

in D'Ambrosio's Rule 60(b) motion and that D'Ambrosio should have been required to exhaust

those claims in state court prior to raising them in the district court.[3]  The Sixth Circuit disagreed,

determining that D'Ambrosio's Rule 60(b) motion did not "present the same sort of exhaustion

issues seen in" Pitchess because D'Ambrosio, unlike the petitioner in Pitchess, was not asserting a

new claim.  Id. at 388-39.  The Sixth Circuit noted that D'Ambrosio had "based his entire argument

for an unconditional writ on the Brady claim which formed the basis of the conditional writ, the

state's failure to comply with the conditional writ, and the events occurring between the time the

district court granted the conditional writ and the time it granted the unconditional writ . . . ."  Id. at

389.  The Sixth Circuit also specifically recognized that D'Ambrosio had not based his request that

---

[3]The state did not challenge the district court's determination that extraordinary circumstances existed that justified both vacating the order granting the unconditional writ and issuing a new order barring retrial.  Consequently, the Sixth Circuit did not consider whether extraordinary circumstances existed in that case.  D'Ambrosio, 656 F.3d at 388, 389 n.11 ("Of course whether 'extraordinary circumstances' that warrant barring reprosecution actually existed is an issue beyond the scope of this appeal because the warden has not challenged the merits of this determination.").

his retrial be barred on "a new and never-before-raised due process claim, but was instead seeking the modification -- in order to bar reprosecution -- of the unconditional writ based on the Brady violation and the failure to comply with the conditional writ."  Id.  The circumstances of the instant case are, however, very different from the circumstances of D'Ambrosio.  Wilson's claims for relief pursuant to Rule 60(b) are not based on the Batson claim he raised in his habeas petition, his claims are based on new and never before raised claims of delay and prejudice arising from that delay. Moreover, while the district court determined that the state had violated the conditional writ issued in D'Ambrosio, there has been no such determination in this case.  To the contrary, we have concluded that the Commonwealth did not violate the conditional Writ we issued on April 19, 2004. We conclude that D'Ambrosio does not support Wilson's contention that he need not exhaust his Rule 60(b)(6) claims in state court.

Wilson also argues that he should not have to exhaust his claims in state court because there is no remedy available to him in state court.  See 28 U.S.C. § 2254(b)(1)(B)(ii) (excusing exhaustion where "circumstances exist that render [the available state corrective process] ineffective to protect the rights of the applicant").  Wilson admitted, during the argument held on April 11, 2012, that he could raise both a Sixth Amendment speedy trial claim and a state law speedy trial claim pursuant to Pennsylvania Rule of Criminal Procedure 600 in the state court, through an omnibus pretrial motion in connection with his retrial.  He claims, however, that asserting such a motion in state court would not be effective to protect his rights and, in fact, would only compound the prejudice he has already suffered as a result of the Commonwealth's delay, because he has no confidence that such a motion would be timely adjudicated.  Wilson's argument thus presupposes that the state courts will simply fail to protect his rights under the Sixth Amendment and Pennsylvania law.  The exhaustion

rule, however, precludes our interference in ongoing state court proceedings based on the supposition that the state courts will not protect a petitioner's constitutional rights.  As we noted earlier, the purpose of the exhaustion rule is to "protect[] sovereign states from presumptuous correction of their constitutional errors until their courts have been given every opportunity permitted in their procedure to correct their own mistakes."  DiSimone, 518 F.3d at 127.

For the foregoing reasons, we conclude that the claims Wilson raises in the Rule 60(b)(6) Motion together constitute a claim that Wilson's Sixth Amendment speedy trial rights have been violated.  This is a new claim that has arisen since we granted the Writ in 2004 and it does not relate to the Batson violation upon which we granted the Writ in 2004.  We further conclude, accordingly, that Wilson's Rule 60(b)(6) claims must be exhausted in state court before they can be raised in this court.  Moreover, as we discuss infra, even if we were to find that Wilson was not required to exhaust these claims in state court, we would deny the Rule 60(b)(6) Motion on the merits because Wilson has been unable to establish that extraordinary circumstances exist in this case that would warrant the relief he seeks.

C.    Extraordinary Circumstances

Wilson contends that extraordinary circumstances exist that warrant both vacating our April 19, 2004 Order and barring his retrial for the Swift murder.  The Circuit Courts of Appeal that have considered the issue all agree that a habeas court may bar a petitioner's retrial in exceptional circumstances.[4]  As the United State Court of Appeals for the Fifth Circuit has explained:

> In rare circumstances, a habeas court can end a state criminal proceeding as part of the habeas remedy.  If the constitutional

---

[4]The parties have not cited any Third Circuit decisions analyzing this issue and we are aware of no such decisions.

problem that led to the grant of the writ cannot be cured by a new trial -- for example, if a double jeopardy violation merits habeas relief -- then the habeas court can permanently end the state criminal proceeding.  "For a federal court to exercise its habeas corpus power to stop a state criminal proceeding 'special circumstances' must exist . . . .  [T]he constitutional violation must be such that it cannot be remedied by another trial, or other exceptional circumstances [must] exist such that the holding of a new trial would be unjust."

Jones v. Cain, 600 F.3d 527, 542 (5th Cir. 2010) (alterations in original) (quoting Capps, 13 F.3d at 352-53, and citing Foster v. Lockhart, 9 F.3d 722, 727 (8th Cir. 1993)). See also DiSimone, 518 F.3d at 127 ("[I]n special circumstances federal courts may bar retrial of a successful habeas corpus petitioner without his having first sought protection from retrial in the state courts.  In all but the most extreme circumstances, this would be appropriate only when the grant of habeas corpus is premised on a theory which inevitably precludes further trial."); Foster, 9 F.3d at 727 (noting that barring retrial "is an extraordinary remedy that is suitable only in certain situations, such as when a retrial itself would violate the petitioner's constitutional rights" (citing Latzer v. Abrams, 615 F. Supp. 1226, 1230 (E.D.N.Y. 1985)).

We conclude that there are two grounds upon which we could issue an absolute writ of habeas corpus that also barred the Commonwealth from ever retrying Wilson for the Swift murder: (1) if the constitutional violation upon which we granted the writ could not be cured by a retrial, such as where the petitioner's double jeopardy rights were violated by his first trial, Jones, 600 F.3d at 542; and (2) if there are other exceptional circumstances that would make a retrial unjust, such as where there is both significant evidence of actual innocence and the passage of time since the original trial has made it impossible for the state courts to ensure that the petitioner will be fairly retried, see Morales v. Portuondo, 165 F. Supp. 2d 601, 609 (S.D.N.Y. 2001).  The first ground

22

clearly does not exist in this case since our grant of the writ of habeas corpus vacating Wilson's conviction "was not predicated on a ground that inevitably precludes retrial." DiSimone, 518 F.3d at 127. Rather, our April 19, 2004 Order was based on a Batson violation which may be remedied by Wilson's retrial before a constitutionally selected jury. Consequently, our determination of whether exceptional circumstances exist in this case that warrant barring Wilson's retrial for Swift's murder centers on whether he has established evidence of his actual innocence, and/or the existence of exceptional circumstances that could not be fairly addressed by the state court in connection with his reprosecution for the Swift murder.[5]

Wilson urges us to apply, instead, a standard developed for habeas cases by the United States Court of Appeals for the Sixth Circuit. The Sixth Circuit determined that "in extraordinary circumstances, such as when the state inexcusably, repeatedly, or otherwise abusively fails to act within the prescribed time period or if the state's delay is likely to prejudice the petitioner's ability to mount a defense at trial, a habeas court may forbid reprosecution." Satterlee, 453 F.3d at 370 (internal quotation omitted).[6] This standard fits the procedural posture of this case, i.e., a motion filed after the writ of habeas corpus was granted, alleging that the state's actions or inactions since the writ was issued require a habeas court to reconsider whether a petitioner's retrial should be

_____

[5]Wilson has not presented any new evidence of his actual innocence of the Swift murder.

[6]Mere failure to timely retry the petitioner does not, by itself, constitute an extraordinary circumstance. See Scott, 359 F. App'x at 582-83 ("'[T]he mere fact that a new trial has not been held within the time period for which continued imprisonment was authorized cannot, by itself, justify the court in doing anything more than ordering the prisoner released once the prescribed time for keeping him in prison has expired.'" (quoting Flenoy v. Russell, No. 89-3326, 1990 WL 61114, at *3 (6th Cir. May 8, 1990))); see also Girts v. Yannai, 600 F.3d 576, 585 (6th Cir. 2010) (noting that the court had not found any case in which retrial was barred because the state failed to reprosecute the defendant during the 180 days provided in the conditional writ of habeas corpus).

23

allowed.  However,  Petitioner has identified only one case, D'Ambrosio v. Bagley, 688 F. Supp. 2d 709[7], in which a habeas court found that extraordinary circumstances existed that justified granting the relief Wilson seeks in this case.  As we described in Section III.B., *supra*, the district court based its finding that extraordinary circumstances existed based on both the state's violation of the conditional writ and the death of the state's central witness against the petitioner.

The instant case is materially different from D'Ambrosio.  First, the claims in D'Ambrosio involved *continuing* Brady violations similar to those for which the district court first granted relief.  Second, the state's new Brady violations violated the original, conditional writ by undermining the state court's ability to ensure that D'Ambrosio received a fair retrial.  See id. at 712 (stating that the state violated the "Court's September 11, 2008 Order when it did not respond to multiple discovery requests, produced material . . . discovery on the eve of trial, and then sought to interfere with the orderly progress of the trial through gamesmanship" (internal quotation omitted)).  In contrast, Wilson's claims in the Rule 60(b)(6) Motion are wholly unrelated to the Batson violation upon which the April 19, 2004 Writ was based.  Moreover, the Commonwealth's failure to retry Wilson within 180 days of our April 19, 2004 Order did not violate the Writ.  Furthermore, D'Ambrosio alleged that the state committed affirmative acts of misconduct, not merely inaction, which directly caused the prejudice he faced in connection with his retrial.  In this case, however, Wilson has not alleged that the Commonwealth committed any affirmative misconduct that led to his, or Guess's incompetency and the resulting prejudice.  Consequently, while D'Ambrosio's circumstances may

---

[7]The Sixth Circuit affirmed this decision.  See D'Ambrosio, 656 F.3d at 390.  However, as we mentioned in footnote 4, the Sixth Circuit did not consider the merits of the district court's determination that extraordinary circumstances existed that justified both vacating the writ and issuing a new order barring retrial.  Id. at 388, 389 n.11.

have been so extraordinary that they merited barring his retrial, they are so different from the circumstances of our case that we conclude that the standard developed by the Sixth Circuit is inapposite to this case.  We turn, therefore, to the three circumstances which Wilson claims warrant barring his retrial.

### 1.   The Commonwealth's lengthy delay in commencing Wilson's retrial

In order to succeed on the Rule 60(b)(6) Motion, Wilson must establish evidence of exceptional circumstances that would make a retrial unjust and that cannot be fairly addressed by the state court in connection with his reprosecution for the Swift murder.  As we mentioned, *supra*, Wilson argues that extraordinary circumstances exist here because the Commonwealth delayed his retrial for more than five years.  The Commonwealth initiated the proceedings intended to lead to Wilson's retrial on January 22, 2010, when the Philadelphia County Court of Common Pleas appointed counsel for him in connection with his prosecution for the Swift murder.  Commonwealth v. Wilson, No. 51-CR-1229141-1983, docket (Phila. Cnty.C. P.).  As Wilson points out, this took place more than five years after our April 19, 2004 Order required his unconditional release from incarceration based upon his conviction for Swift's murder.  The Commonwealth has explained that its "inaction was the result of [Wilson's] separate murder conviction, which made the sentence in this case redundant until the other conviction was *also* reversed."  (Resp'ts' 3/15/10 Mem. at 2.)

Wilson contends that this delay, on top of the twenty years he spent in prison after his conviction for Swift's murder, is so extraordinary that it warrants vacating our April 19, 2004 Order and may only be adequately remedied by an order barring his retrial.  Wilson relies on Morales, in which the district court noted that "[t]he federal courts have barred retrial of successful habeas petitioners in only the rarest of circumstances. The courts have done so . . . 'where the petitioners

25

had served extended and potentially unjustifiable periods of incarceration before the writ was granted.'" Morales, 165 F. Supp. 2d at 609 (quoting Latzer, 615 F. Supp. at 1230; and citing United States ex rel. Schuster v. Vincent, 524 F.2d 153, 154, 158, 162 (2d Cir. 1975). The Morales court granted unconditional writs of habeas corpus to Jose Morales and Ruben Montalvo, barring their retrial for the murder of Jose Antonio Rivera, after they had each served thirteen years in prison. Id. at 602-03, 607. The Morales court based its decision to bar retrial in that case on the following three grounds:

> First, on the record before the Court, no reasonable jury could convict Morales or Montalvo of murder; indeed, the evidence strongly suggests that they are innocent. Second, Morales and Montalvo have been severely prejudiced by the passage of time; they have "served extended and potentially unjustified periods of incarceration" and their ability to defend against the charges in any new trial has been hampered, at least in some respects. In addition, certain aspects of the District Attorney's Office's handling of this matter are troubling; this yet another consideration weighing against permitting a re-trial.

Id. at 609. The Morales court stated that no reasonable jury could convict Morales and Montalvo because the evidence presented by the prosecution at their trial was very weak, two other men had confessed to the murder, and an eyewitness to the murder claimed that Morales and Montalvo were not there. Id. at 609-11. Unlike the petitioners in Morales, however, Wilson has not presented new exculpatory evidence that, when coupled with his previous time spent in jail for the Swift murder, warrants barring his retrial. The Morales court, moreover, made its decision to bar retrial of the petitioners "at a crucially different point in the litigation" than we face in the instant case. Girts v. Yannai, 600 F.3d 576, 583 (6th Cir. 2010). The Morales court made its decision to bar reprosecution as a part of its consideration of the petitioners' habeas petitions, when it was necessarily addressing claims that had first been exhausted in state court. In this case, unlike Morales, we are being asked

26

to decide claims relating to post-writ delay that are completely unrelated to the constitutional claims asserted by the petitioner in his habeas petition.

In order to vacate our April 19, 2004 Order granting the Writ and issue a new order granting an unconditional writ that also bars Wilson's retrial for the Swift murder, we must first find that extraordinary circumstances exist that cannot be remedied by another trial and that would make the holding of a new trial unjust. See Jones, 600 F.3d at 542. We are aware of no obstacle that would prevent the Pennsylvania state courts from protecting Wilson's rights relative to the Commonwealth's delay in commencing his reprosecution. Indeed, Wilson could assert this claim in state court pursuant to Pennsylvania Rule of Criminal Procedure 600 or as a claim that his Sixth Amendment right to a speedy trial has been violated. While the Commonwealth's more than five year delay in commencing Wilson's reprosecution for Swift's murder was unusual, since his claims can be addressed by the state courts in connection with his retrial, that delay alone does not render the circumstances of this case extraordinary. We conclude that the Commonwealth's delay in commencing Wilson's reprosecution for the Swift murder does not present extraordinary circumstances that cannot be fairly addressed by the state courts in connection with his retrial and that it would not be unjust to require Wilson to present this claim in the state courts before seeking federal habeas relief. See Jones, 600 F.3d at 542.

2.   Wilson's competency to stand trial

Wilson also argues that extraordinary circumstances exist in this case because, during the time in which the Commonwealth delayed his retrial, his mental condition deteriorated to such an extent that he is no longer competent to stand trial for the Swift murder. Both Wilson and the Commonwealth have presented voluminous evidence with respect to the state of Wilson's mental

27

health since 2005, and with respect to his current competency to stand trial.  Wilson has not raised the issue of his competency to stand trial before the state court.

During the Hearings held on May 31, 2011 and June 24, 2011, Wilson called Dr. Kessel, a forensic psychiatrist, as an expert witness with respect to his mental health and competency to stand trial.  (5/31/11 Hr'g Tr. at 3-4.)  In 1997, she was retained by Wilson's PCRA counsel in connection with his collateral attack on his conviction and sentence for the murder of Jamie Lamb.  (Id. at 7.)  In that position, she performed a direct evaluation of Wilson and reviewed his medical and other records.  (Id. at 8.)  At that time, she diagnosed Wilson with a delusional disorder characterized by prominent paranoia, a mixed personality disorder in the psychotic cluster, and organic brain damage.  (Id. at 9.)  Wilson's delusions included a belief that he was being poisoned and that police officers wanted to hurt him.  (Id. at 10.)

Dr. Kessel was retained by Wilson again in 2010 and asked to determine whether his mental health had deteriorated since 2004 and whether he is presently able to work with his counsel.  (Id. at 18.)  Since Dr. Kessel has not met with Wilson since 1997, she evaluated his present mental condition by reviewing his Department of Corrections records dating from 1984 through 2010, and by reviewing a letter that Wilson wrote to this Court that was never sent.  (Pet'r's Ex. 2 at 1; 5/31/11 Hr'g Tr. at 21.)  Dr. Kessel also interviewed Wilson's present counsel regarding his ability to assist them and listened in on a conversation between Wilson and his attorneys.  (Pet'r's Ex. 2 at 1, 11.)  Dr. Kessel prepared a report about Wilson's condition dated September 27, 2010, in which she reached the following opinion, "within a reasonable degree of medical and psychiatric certainty":

> Mr. Wilson has now reached a point where he is not capable of assisting counsel, working with counsel, or participating meaningfully in his case, as a result of his mental illness.  Though he may have a

> basic understanding of the court proceedings, he is not able to meaningfully interact with and assist counsel in the development of a rational defense strategy.  His trust in his legal team has eroded due to his mental illness.  He is thoroughly preoccupied with paranoid delusions, fear and anger generated by those delusions, and counsel's inability to stop the torture he believes is being inflicted upon him.  His mood is labile.  The organization of his thoughts and the expression of his speech becomes disorganized when he is upset.  He is limiting contacts with his legal team due to his delusional beliefs.  He is unable to deal with his circumstances in a rational, logical manner.  In my opinion, he is no longer competent to participate in legal proceedings.

(Id. at 11-12.)  Dr. Kessel's opinion of Wilson's competency to stand trial had not changed when she testified with respect to his competency on May 31, 2011.  (5/31/11 Hr'g Tr. at 69.)  However, she also testified that Wilson could become competent to stand trial if he took appropriate medications.  (6/24/11 Hr'g Tr. at 98.)

Billy H. Nolas, Esq., one of Wilson's attorneys, also testified with respect to his competency.  (7/14/11 Hr'g. Tr. at 2-3.)  Nolas has represented Wilson since 1996.  (Id. at 3-4.)  Mr. Nolas believes that, prior to 2007, Wilson had a basic understanding of the issues in both of his cases and could listen to Nolas's advice.  (Id. at 8.)  However, beginning in 2007, Wilson's mental state deteriorated progressively to the point where he could not take his counsel's advice and did not have an understanding of the legal issues in his case, was unable to focus on his legal issues because of his preoccupation with his delusions and, in fact, could not interact with his counsel at all when counsel wanted to discuss his mental health.  (Id. at 8-20.)

Wilson's daughter, Natasha White-Wayns, also testified about her father's mental health.  (6/2/11 Hr'g Tr. at 75.)  She speaks to her father at least twice a week and usually visits him in prison at least three times a month.  (Id. at 76.)  However, Wilson stopped visiting with her three or

four years ago.  (Id. at 76-77.)  In the beginning of that period, in 2007 or 2008, Wilson informed his

daughter that he believed a Philadelphia Police Officer had set him up and was trying to kill him.

(Id. at 78-79.)  This behavior lasted until last year, and Wilson now allows her to visit again.  (Id.

at 76.)

        In rebuttal, the Commonwealth played four excerpts from Wilson's prison telephone calls

and presented the testimony of Dr. Robert W. Stanton, a forensic psychiatrist.[8]  In the telephone

calls, recorded on March 9, 2010, March 16, 2010, November 16, 2010, and December 21, 2010,

Wilson cogently discussed the differences between his two cases, the instant Motions filed by his

attorneys, and his counsels' legal strategy.  (Resp'ts' Ex. 4 at 23-35, 45, 49-51, 55-58, 70, 73-76, 91,

93-95.)  Dr. Stanton is a forensic psychiatrist who works as the Medical Director for the Philadelphia

County Court of Common Pleas. (7/14/11 Hr'g. Tr. at 74-75.)  In this position, he performs three or

four hundred pre-trial competency assessments a year.  (Id. at 75.)  He performed a psychiatric

evaluation of Wilson on January 26, 2011.  (Id. at 76.)  After examining Wilson, Dr. Stanton felt that

he "is aware of his charge, has a working knowledge of the legal process and is able to cooperate

with counsel." (Id. at 80.)  Dr. Stanton did not see any evidence that Wilson was suffering from

delusions or psychosis.  (Id. at 81.)

        Wilson maintains that, in order to decide the issue presented in this claim, i.e., whether this

case presents extraordinary circumstances because he has become incompetent to stand trial during

the time the Commonwealth delayed his retrial for the Swift murder, we must first decide whether

---

[8]The Commonwealth also presented the testimony of another forensic psychiatrist, Dr. Carla
Rodgers, who attempted to perform a psychiatric examination of Wilson on March 4, 2011. (7/14/11
Hr'g. Tr. at 115.)  Wilson refused to meet with her because his attorney was not present.  (Id. at 116-
19.)

he is presently competent to stand trial in state court. There is conflicting evidence as to Wilson's present competency to stand trial.  There is evidence that he has recently suffered delusions and has been unable to cooperate fully with his counsel.  There is also evidence that he has recently been able to cogently discuss the instant proceedings and his counsel's legal strategy.  In addition, Wilson asks that, if we find that he is presently incompetent to stand trial, we also conclude, in accordance with Sell v. United States, 539 U.S. 166 (2003), that the Commonwealth may not forcibly medicate him in order to restore his competency to stand trial.[9]

Wilson has not raised the issue of his competency in the Philadelphia Court of Common Pleas and that court has had no opportunity to consider the question of whether he should be forcibly medicated if he is incompetent and refuses psychiatric care and medication.  We are aware of no reason why the state courts would be unable or unwilling to address these questions as they pertain to Wilson's retrial for the Swift murder.  Indeed, this Court is not the correct tribunal to decide, in the first instance, whether Wilson is competent to stand trial in state court and, if not, whether the state court should order the Commonwealth to forcibly medicate him to restore his competency. These are issues that should be decided by a state court judge, who would have the power to order any necessary medical treatment.  Moreover, the relief sought in the Rule 60(b)(6) Motion, a complete bar to Wilson's reprosecution for Swift's murder, would not necessarily or logically flow from a determination that he is presently incompetent to stand trial.  We conclude that Wilson's mental health concerns do not present extraordinary circumstances that cannot be fairly addressed by the state courts in connection with Wilson's retrial for the Swift murder  and that it would not be

---

[9]In Sell, the Supreme Court set out the factors which must be considered by a trial court deciding whether to allow the government to forcibly medicate a defendant to make him competent to stand trial.  Sell, 539 U.S. at 180-81.

31

unjust to require Wilson to present this claim in the state courts before seeking federal habeas relief. See Jones, 600 F.3d at 542.

        3.      <u>Guess's competency to testify at trial</u>

Wilson further argues that extraordinary circumstances exist in this case because the mental health of prosecution witness Leonard Guess has deteriorated since 2005 to such an extent that he is presently incompetent to testify at trial. As we described, *supra*, Guess was the sole eyewitness to Swift's murder and his credibility was a central issue at Wilson's trial. Consequently, Wilson's attorneys sent an investigator, Gary Hendrix, to look for Guess in connection with the instant Motions. (Hendrix Decl. ¶ 2.) Hendrix spoke to relatives of Guess, who told him that Guess had a stroke in the 1990s that affected his thinking and memory and that his mental condition "deteriorated rapidly after his mother died in 2005." (Id. ¶ 4.) Guess's relatives also reported that "Guess would not be able to testify coherently or remember details. His memory has serious gaps and he gets easily confused." (Id.) In May 2011, Hendrix found Guess living in a homeless shelter in Atlantic City, New Jersey. (6/2/11 Hr'g Tr. at 50.) Hendrix spoke to Guess and asked him to sign releases allowing Wilson's attorneys to obtain his (Guess's) medical and mental health records.[10] (Id. at 51.) Hendrix read the releases aloud to Guess and Guess signed them. (Id.) Wilson's attorneys used the releases to obtain Guess's medical and mental health records, which they provided

---

[10]Prior to meeting with Guess, Hendrix spoke with the manager of the homeless shelter, who informed Hendrix that Guess's memory has deteriorated over the last six years and that Guess has difficulty remembering who he (the manager) is and what his name is. (6/2/11 Hr'g Tr. at 57.) In addition, prior to asking Guess to sign the releases, Hendrix asked Guess if he remembered Wilson and if he recalled testifying at a homicide trial. (Id. at 59-60.) Guess denied both remembering Wilson and testifying at a homicide trial. (Id.) We question whether counsel sufficiently considered the ethical implications of obtaining releases from an individual whom they had reason to believe was incompetent, for the sole purpose of obtaining medical records which they intended to use precisely to establish his incompetence.

to Dr. Kessel and entered into evidence in this proceeding.  (See 6/24/11 Hr'g Tr.  at 76-79; Pet'r's Exs. 10-17.)

Dr. Kessel testified regarding her review of Guess's medical records during our June 24, 2011 Hearing.  She did not offer an opinion of Guess's competency to testify at Wilson's trial.  (6/24/11 Hr'g Tr. at 91.)  However, she did testify as to certain facts that she learned from those records.  Dr. Kessel reported that Guess had a stroke in 1993 and has since suffered from serious medical conditions, including seizures.  (6/24/11 Hr'g Tr. at 82-83.)  She also found that he has had four psychiatric admissions since 2005, for depression and schizo-affective illness.  (Id. at 84-85.)

Wilson's attorneys called Guess as a witness during our June 2, 2011 Hearing to demonstrate that he is not a competent witness.  (6/2/11 Hr'g Tr. at 22.)  Guess testified that he had a stroke in 1995 and takes medication for seizures.  (Id. at 31-32.)  He currently attends a program to help him stay focused.  (Id. at 34-35.)  He has problems with his memory and also has trouble sleeping.  (Id. at 36.)  Guess remembered Wilson and was able to identify him in court.  (Id. at 38-39.)  He claimed to remember Swift's shooting; however, his June 2, 2011 description of the shooting varied in significant respects from his trial testimony.  (Compare 6/2/11 Hr'g Tr. at 39-45 with N.T. 5/11/84 at 2.35-2.51.)

Wilson asks us to find that Guess would be incompetent to testify at Wilson's retrial based upon the substantial inconsistencies in his recent testimony regarding the Swift murder as compared with his trial testimony.  Wilson also asks us to conclude that he would be significantly prejudiced by Guess's consequent unavailability because he would not be able to question Guess about a previously undisclosed Brady violation.  Wilson bases his arguments regarding this new, alleged Brady violation on the testimony of Louis Scott, owner of Scotty's Garage, during our June 2, 2011

33

evidentiary hearing.  Scott testified that he did not see Guess for approximately two weeks after Swift was shot and, when he saw Guess again for the first time, Guess told him that he had been locked up for the Swift murder and that he had told the police that Wilson committed the murder so that they would let him out of jail.  (6/2/11 Hr'g. Tr. at 7-8.) Wilson contends that Scott's testimony significantly impeaches Guess's previous testimony that he was not threatened with arrest for the Swift murder.[11]  It nearly goes without saying that Wilson has not asserted this claim in the state court.

Wilson has made no showing that the state trial court cannot assess Guess's competency to testify under state law or that it cannot consider his new Brady claim.  He also has not  brought to our attention any circumstances that would render the trial court's consideration of Guess's competency, or his new Brady claim, unjust or ineffective to protect his rights.  The issues Wilson raises with respect to Guess are issues that the state courts are fully capable of addressing in the first instance.   We conclude that Guess's mental health concerns do not present extraordinary circumstances that cannot be fairly addressed by the state courts in connection with Wilson's retrial for the Swift murder.  See Jones, 600 F.3d at 542.  We conclude, therefore, that Guess's mental health concerns and Wilson's new Brady claim with respect to Guess do not present extraordinary circumstances that cannot be remedied by the state courts in connection with Wilson's retrial for Swift's murder  and that it would not be unjust to require Wilson to present this claim in the state courts before seeking federal habeas relief.   See Jones, 600 F.3d at 542.

_____

[11]Guess testified, during our June 2, 2011 Hearing, that he was never suspected of Swift's murder and was never arrested for that murder.  (6/2/11 Hr'g Tr. at 47.)  That is consistent with his testimony at Wilson's trial.  (See 5/11/84 N.T. at 2.78.)

In summary, none of the circumstances that Wilson raises in support of the Rule 60(b)(6) Motion are so extraordinary that they warrant relief under Rule 60(b)(6) or warrant barring his retrial. Moreover, as we discussed in Section III.B., none of these claims have been exhausted in the state courts. Instead of raising his claims arising from the Commonwealth's delay in commencing his retrial in state court, Wilson asks us, in essence, to intervene in his state court criminal proceedings to prevent the state court from committing possible future violations of his Constitutional rights. The Supreme Court, however, has made it clear that we cannot use Rule 60(b) to "maintain a continuing supervision over a retrial conducted pursuant to a conditional writ" of habeas corpus. Pitchess, 421 U.S. at 490 (citation omitted)).

We conclude that our consideration of Wilson's claims at this time, before the state courts have had the opportunity to consider those claims, would subvert "the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts." Williams v. Taylor, 529 U.S. 420, 436 (2000). As the Supreme Court has explained, "[i]n keeping this delicate balance we have been careful to limit the scope of federal intrusion into state criminal adjudications and to safeguard the States' interest in the integrity of their criminal and collateral proceedings." Id. (citing Coleman v. Thompson, 501 U.S. 722, 726 (1991); and McCleskey v. Zant, 499 U.S. 467, 493 (1991)). Our intervention in Wilson's state court criminal proceedings by barring his retrial for the Swift murder based upon claims of prejudice that could be, but have not been, considered by the state courts, would constitute an unwarranted imposition on the integrity of Pennsylvania's state court criminal proceedings. Wilson's Rule 60(b)(6) Motion is, therefore, denied.

**IV.     CONCLUSION**

For the foregoing reasons, the Motion to Enforce Writ and the Rule 60(b)(6) Motion are denied without prejudice to Wilson's asserting these claims, if necessary, in a future petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 after his retrial for the murder of David Swift.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.